## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **MARCUS BARROWS,** | : | No. 3:02CV1082 (DJS) |
| **Plaintiff,** | : | |
| **-v-** | : | |
| | : | |
| **NEVERILL COLEMAN and** | : | |
| **SHANNON BELCHER** | : | |
| **Defendants.** | : | |

### MEMORANDUM OF DECISION

_____Defendants, Neverill Coleman and Shannon Belcher, move for summary judgment on all claims brought by plaintiff Marcus Barrows. Plaintiff also motions for summary judgment on all claims. The parties agree that there are no genuine issues of material fact remaining to be tried. Plaintiff's motion **[doc. #19]** is **DENIED** and defendants' motion **[doc. #16]** is **GRANTED** for the following reasons.

### Facts

There is no dispute regarding the events underlying this case. The defendants, Neverill Coleman ("Coleman") and Shannon Belcher ("Belcher"), are both detectives with the Connecticut State Police. They were assigned, on April 19, 2000, to investigate an alleged sexual assault committed at the Willington, Connecticut rest area along Interstate 84. The alleged assault took place, approximately, between 8 a.m. and 8:15 a.m. on April 19. The defendants initially went to the rest area and spoke to the attendant, Robert Lajoie ("Lajoie") who told them that he had arrived at 7:55 a.m. to relieve the night attendant, plaintiff Marcus Barrows ("Barrows"). Coleman, along with State Trooper Clifford Labbe ("Labbe") took a statement from Lajoie in which Barrows was described as a black male, 27 years of age, wearing blue jeans and an orange sweatshirt with a printed word on the back. Belcher inspected the ladies' bathroom where the alleged assault occurred. The defendants then drove to a hospital in Worcester, Mass. where the

victim received treatment.

At the hospital, Belcher and Coleman spoke with Officer John Martella ("Martella") of the University of Massachusetts Police Department. Martella gave to Belcher the sexual assault evidence kit, containing hair, blood and other samples from the victim. Both defendants then met with the victim, who stated that after the assault she had driven to her home where she told a friend, Rosita Bigwood, about the incident. Belcher then went to interview Bigwood, while Coleman interviewed the victim.

The victim stated that she parked her car at the rest area around 8 a.m. and proceeded to use the rest room. She explained that her assailant was a black man, around 5'7" tall, with a muscular build and short black hair combed to the front. The assailant allegedly had a dark complexion and was wearing dark blue jeans and a thin, long-sleeved, red T-shirt. She also described two identifying marks on the attacker. The first was a light-colored birth mark, about the size of a nickel, on the upper inner right thigh of the attacker; the second an approximately two-and-one-half inch scar on the center-right of his abdomen, below the belly.

According to the victim, she ran to her truck when the assault ended and drove away from the rest stop. She stated that the time was announced on the radio as 8:15 a.m. She drove straight home, told Bigwood about the attack, and then called the Millbury police and was taken by ambulance to the hospital.

Belcher's interview with Bigwood revealed a similar set of details. According to Bigwood, the victim knocked on her door at approximately 9 a.m. and was very distraught. Bigwood listened as she described the assault. Bigwood told Belcher that she tried to call the Connecticut State Police but could not get through and then decided to call the Millbury Police. According to Bigwood, the victim described the assailant as a dark-skinned black man, about

5'7"-5'9" tall with a heavy build, short hair and possibly a Jamaican accent. Bigwood advised Montgomery not to shower until she had contacted police.

Coleman again visited the rest area on April 20. He arrived at about 8 a.m. and spoke with Barrows, who was brushing his teeth in the men's rest room. Coleman describes Barrows as around 5'7", dark-skinned, with a muscular build and short black hair. Barrows was, on April 20, wearing clothes that matched the description provided on April 19–an orange, long-sleeved hooded sweatshirt with a printed word on the back and black jeans. Coleman told Barrows that he needed to speak with him regarding the assault. After some discussion of the appropriate time and place for a meeting, Barrows followed Coleman to the Troop C barracks where Coleman was stationed. Coleman told Barrows he could leave at any time and then brought him to an interview room. Coleman, joined by William Shemansky ("Shemansky"), then interviewed Barrows.

Coleman explained that a woman had been assaulted at the rest area on April 19. Shemansky asked Barrows if he had any tattoos and Barrows said no. Shemansky asked Barrows to lift his shirt. Coleman did not see a scar on the right side of Barrows's abdomen but did note a horizontal scar on Barrows's left side near his abdomen. Shemansky asked Barrows if he would show the officers his upper inner thigh. Barrows lowered his pants and Coleman did not see any birthmark on either of his legs. Coleman asked Barrows if he would consent to having his picture taken, but Barrows objected.

Shemansky asked Barrows if he had been in the ladies' restroom cleaning and Barrows said that he had been cleaning the bathroom on the morning in question. Barrows also indicated that he thought he saw someone in the first stall of the restroom. Coleman asked again if Barrows would consent to a photograph. Barrows refused and Coleman said that he would take a picture despite the objections. Coleman instructed Barrows to stand against a nearby wall. Barrows

complied and Coleman took two pictures. Barrows then left the barracks.

The victim arrived at Troop C's barracks around 11 a.m. on April 20. Coleman escorted her to Shemansky's office where they met Belcher. Coleman worked with the victim to create a composite of the assailant using a computer program. Once the composite was complete, Coleman showed the victim a photo array that included the pictures of Barrows. She did not identify her attacker in any of the pictures. Coleman then re-interviewed the victim, at which time she indicated that the scar and birthmark were on the left, not right side of the assailant's body.

On May 11, 2000, Coleman met with Barrows at the rest area and told him that the victim had picked his picture out of the photo array. Coleman questioned Barrows about his statement that a woman was in the bathroom when he was cleaning it and Barrows said that when he entered the rest room to empty the trash a woman said "I'm in here." Barrows noticed her shoes in the first stall, emptied the trash and left the bathroom. Coleman also told Barrows that the victim had described a scar similar to the scar on Barrows's body. Coleman asked Barrows to take a lie detector test but Barrows stated that he would prefer a DNA test because a DNA test would clear him. Barrows then ended the interview.

Coleman prepared a search warrant for authorization to take blood and hair samples from Barrows and also photographs of the scars and marks on Barrows's body. Belcher reviewed the warrant affidavit and served as the co-affiant on the warrant. Coleman presented the warrant to a Connecticut Superior Court judge who found probable cause to support the search. Belcher was not involved in the investigation in any way other than the manner described here. She did not conduct any interviews with Barrows and did not directly compile any evidence in this case, other than the interview with Bigwood.

4

Coleman, along with Sergeant Charles York ("York") and Trooper Michael Hearn ("Hearn"), presented the search warrant to Barrows on May 12. Coleman handcuffed Barrows behind his back and placed him in the front seat of York's cruiser. Barrows was transported to Rockville hospital where the blood samples were taken. He was again handcuffed and placed in the front seat of York's cruiser for the trip to Troop C's barracks where hair samples were taken and Coleman photographed Barrows's legs, thighs and genitals. Barrows was fully cooperative throughout the various searches. The DNA evidence recovered from the samples cleared Barrows as a suspect and the defendants closed their investigation of him and the alleged sexual assault on July 12, 2000.

The contents of the search warrant, based on the investigation described above, are the source of the present dispute. The warrant contained information that approximates the facts related here except for the following omissions. First, Coleman did not mention that he had created a composite of the alleged assailant with the victim's help. Second, the warrant does not include a reference to Lajoie's statement that Barrows was wearing an orange sweatshirt on the day of the alleged assault. Third, the warrant includes no mention of either Bigwood's statement that the assailant may have had a Jamaican accent or the fact that Barrows has no such accent. Fourth, and lastly, the warrant does not include the fact that Barrows is six-foot in height.

There are two other items of information that were not included in the warrant. The assailant is described as having short, dark hair combed to the front. Plaintiff contends that his hair was not combed to the front on the day of the assault. Defendants claim that, as they did not see Barrows on the day of the alleged attack, they simply had no knowledge of the state of his hair on the morning in question and so did not include any reference to its appearance. A dispute also exists concerning the coloring of Barrows's skin. The victim told Coleman, who is black,

that her assailant's complexion was darker than Coleman's coloring. Barrows argues that his skin tone is, objectively, lighter than Coleman's skin and that this physical distinction should have been included in the warrant. Coleman disputes Barrows's conclusion regarding their respective complexions and claims that it is merely an opinion and so not properly subject to inclusion in the warrant.

Defendants also raise an issue of fact that was omitted from the warrant. Barrows testified during his deposition that Lajoie was always late to work and that he may have arrived as late as 8:05 a.m. on April 19. Coleman contends that this testimony places Barrows at the scene of the crime and contradicts any other evidence that might suggest Barrows had left the rest area before the victim arrived at 8:00 a.m. Plaintiff insists that Barrows's statement that he left the rest area at 7:55, 8:00 at the latest, should have been included in the warrant.

## Standard of Review

A motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.'" American Int'l Group, Inc. v. London Am. Int'l Corp., 664 F.2d 348, 351 (2d Cir. 1981) (quoting Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975)).

A dispute concerning a material fact is genuine "'if evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The court must view all inferences and ambiguities in a light most favorable to the nonmoving party.  See Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).  "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper."  Id.

## DISCUSSION

Plaintiff brings two claims against Coleman and Belcher. First, he alleges violation of his constitutional right to be free from search and seizure under the Fourth Amendment unless there is probable cause to execute a search warrant. According to Barrows, the warrant was issued in reckless disregard of the truth and is therefore defective and unconstitutional. Second, he asserts a right under the Fourth Amendment not to be seized and deprived of his liberty by excessive force; in this case Barrows claims that the use of handcuffs during the course of executing the search warrant on his person amounts to an unconstitutional deprivation of liberty. Barrows seeks summary judgment on both claims.

Defendants cross-motion for summary judgment on both claims. Coleman and Belcher argue that, once the defects in the warrant are "cured" there is still probable cause for the search executed on Barrows. Further, they assert that there was no excessive use of force or action taken that was beyond the scope of the search warrant.

### A. Coleman's Warrant Application

Barrows claims that the affidavits submitted in support of Coleman's application for a search warrant contained deliberate and material omissions of fact that render the warrant

7

unconstitutional for lack of the necessary probable cause. Under the Fourth Amendment, an

individual has the right to be free from unreasonable seizures, including the right to be free from

searches made pursuant to a warrant unsupported by probable cause.  "The bulwark of Fourth

Amendment protection, of course, is the Warrant Clause, requiring that, absent certain

exceptions, police obtain a warrant from a neutral and disinterested magistrate. . . ."  Franks v.

Delaware, 483 U.S. 154, 165 (1978).  Barrows was searched pursuant to a warrant issued by a

judicial officer and, accordingly, there is a presumption that probable cause exited for the search.

U.S. v. Awadallah, 349 F.3d 42, 64 (2d Cir. 2003).  The Supreme Court has held that this

presumption is not without limitation:

> where . . . a substantial preliminary showing [is made] that a false statement
> knowingly and intentionally, or with reckless disregard for the truth, was included
> by the affiant in the warrant affidavit, and if the allegedly false statement is
> necessary to the finding of probable cause, the Fourth Amendment requires that a
> hearing be held. . . . In the event that at that hearing the allegation of perjury or
> reckless disregard is established . . . by a preponderance of the evidence, and, with
> the affidavit's false material set to one side, the affidavit's remaining content is
> insufficient to establish probable cause, the search warrant must be voided and the
> fruits of the search excluded to the same extent as if probable cause was lacking
> on the face of the affidavit.

Franks, 438 U.S. at 155-56.  Thus, the presumption of validity attendant to a search pursuant to a

warrant may be rebutted by showing that the affidavit in support of the warrant contained

inaccuracies or omissions if "(1) the claimed inaccuracies or omissions are the result of the

affiant's deliberate falsehood or reckless disregard for the truth; and (2) the alleged falsehoods or

omissions were necessary to the judge's probable cause finding."  U.S. v. Salameh, 152 F.3d 88,

113 (2d Cir. 1998).  "The ultimate inquiry is whether, after putting aside erroneous information

and material omissions, there remains a residue of independent and lawful information sufficient

to support probable cause."  U.S. v. Awadallah, 349 F.3d 42, 65 (2d Cir. 2003) (internal

quotation marks omitted).

Barrows claims that the warrant application drafted by Coleman and Belcher and presented to the judicial officer omitted critical information, which is indicative of their reckless disregard for the truth of the statements in the warrant. "Material omissions from an affidavit are governed by the same rules as false statements." U.S. v. Campino, 890 F.2d 588, 592 (2d Cir. 1989). Reckless disregard for the truth of statements set forth in the warrant "may be inferred where the omitted information was 'clearly critical' to the probable cause determination." Rivera v. U.S., 928 F.2d 592, 604 (2d Cir. 1991). However, "the mere intent to exclude information is insufficient" to satisfy the test set forth in Franks;"'Franks protects against omissions that are *designed to mislead*, or that are made in *reckless disregard of whether they would mislead*, the magistrate.'" U.S. v. Awadallah, 349 F.3d 42, 68 (2d Cir. 2003) (quoting United States v. Colkley, 899 F.2d 297, 300-01 (4th Cir.1990)) (emphasis in original).

Resolving Barrows's challenge to the warrant affidavits is a two-step process. First, the court must correct any false statements and supply any omitted material from the affidavit. See Smith v. Edwards, 175 F.3d 99, 105 (2d Cir. 1999). Second, the court must review the "corrected" affidavit and determine whether, as a matter of law, probable cause remains. See id. Probable cause is "a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability" that the person identified has committed the alleged crime. Illinois v. Gates, 462 U.S. 213, 238 (1983).

The warrant, even when corrected, does not lack sufficient evidence to support a finding of probable cause. Assuming, without deciding, that all of the information plaintiff seeks to include in the warrant is material, there is no basis for finding a constitutional violation under Franks. The uncorrected affidavit clearly established that: (1) the victim did not recognize Barrows's picture; (2) Barrows did not have the birthmark described by the victim; (3) Barrows

9

scar is on the left side of his body; (4) the victim's testimony regarding the location of the attacker's scar was conflicted; (5) Barrows was relieved by Lajoie at approximately 8:00 a.m., slightly before the time of the alleged assault occurred, and left the rest stop immediately. None of the omitted facts significantly changes the picture of events created by the warrant affidavit or otherwise leads to a different conclusion regarding the existence of probable cause.

The omitted information and testimony concerning Barrows's appearance does not weaken the basis for probable cause. The "corrected" warrant would describe Barrows as wearing clothes that do not match those described by the victim, as having identifying marks that possibly do not match those described by the victim, as having hair that is similar to but not exactly like that described by the victim, as being slightly taller than the man described by the victim and, finally, as having skin coloring that could be considered lighter in tone than that of the alleged assailant. This picture of Barrows continues to provide enough support for probable cause to make the warrant lawful. Nothing in the omitted material contradicts or exculpates Barrows; rather, the more detailed descriptions simply add to the uncertainty surrounding his role in the alleged attack. Barrows still fit a rough description of the attacker and although there are discrepancies in the victim's description and Barrows's appearance, they are not so great as to render Barrows obviously innocent of suspicion. The description of Barrows that emerges from the corrected affidavit is substantially identical to the description contained in the uncorrected affidavit and sufficient to create probable cause.

Similarly, the dispute over the time of Barrows's departure from the rest area is not resolved by the corrected affidavit. Additional testimony that Barrows left the facility at around 8:00 a.m. does not change or enhance the information provided by Coleman. At best, the inclusion of Barrows's contention that LaJoie was late would make a finding of probable cause

more, not less, likely. There is, again, nothing in the corrected affidavit that would lessen the grounds for finding probable cause.

The foregoing analysis applies equally to any omissions that might be attributable to defendant Belcher, although there is nothing in the record that supports a finding that she in any way acted with a disregard for the truth. Assuming, for purposes of this motion, that she did recognize the omissions when she reviewed the warrant, there is still no basis in the corrected affidavits for not finding probable cause to issue the search warrant.

**B. Coleman's Use of Handcuffs to restrain Barrows**

Barrows's second claim is one for excessive use of force beyond the scope of the search warrant. It is not clear from either the briefs or the pleadings whether Barrows claims a search beyond the scope of the warrant or excessive use of force, but the claim seems most likely to be one for excessive use of force. Barrows argues that Coleman's use of handcuffs to detain him for the purpose of executing the search warrant was improper. First, Barrows claims that the use of handcuffs was unreasonable given the fact that Barrows cooperated with Coleman in the execution of the warrant. Second, plaintiff contends that even a temporary detention was an unreasonable seizure because Coleman lacked probable cause for the search. Defendants respond that Coleman's use of handcuffs was a reasonable use of force necessary to effect a lawful temporary detention of Barrows to ensure officer safety during the execution of the search warrant.

There is no longer any legitimate claim that defendant Coleman lacked probable cause for his search warrant. The Second Circuit has recognized a general authority for police officers to temporarily detain people during the execution of a search warrant and also to make limited security searches of the detained individuals as a self-protective measure. See, United States v.

Fullwood, 86 F.3d 27, 29-30 (2d Cir. 1996); Rivera v. United States, 928 F.2d 592, 606-607 (2d Cir. 1991). There does not appear to be a clear standard of law governing this general power. The length of the detention, the likelihood of danger to the searching officers and the conduct during the detention are all factors that appear to inform a decision regarding the appropriate scope of the detention and the security search. Coleman's actions were a reasonable use of this limited authority and do not rise to the level of a constitutional violation.

Barrows was transported to the various locations where the search was executed in a state police cruiser. It is undisputed that the cruisers do not have a protective shield between the officers and detained individuals. It is also undisputed that the state police have a policy that requires them to transport detained individuals in the front seat of the cruiser. At the time the search warrant was served Barrows was a suspect in a serious, violent crime. Although he was subsequently exonerated from involvement in the April 19 rape, it was not unreasonable for the police to be suspicious of Barrows's intentions and interested in maximizing their own security. The fact that Barrows cooperated with the police is a credit to him and it is undoubtedly unfortunate that he was made to endure such an embarrassing incident; however, embarrassment is not sufficient to create a constitutional violation where the actions of the police are reasonable under the circumstances.

Coleman had a legitimate concern that, if Barrows was indeed a violent criminal, he could be in danger if Barrows had free movement and access to the police during his time in the cruiser. Barrows emphasizes that Coleman did not use the handcuffs except for short periods at the rest stop, in the cruiser and in the hospital and also that Coleman did not use the handcuffs when driving Barrows back to his job. This selective use of the handcuffs is most properly viewed as evidence that Coleman was seeking only to ensure safety during the execution of the

search warrant, as was proper. Once Barrows was not in a position to attempt escape prior to the execution of the warrant, there was no basis for the use of handcuffs and Coleman acted accordingly. Indeed, it seems clear that the authority to detain only extends to the completion of the search and no longer. Thus, once all searches of Barrows's person had been completed there was no legal authority to use the handcuffs and Coleman no longer had legal authority to detain Barrows. Coleman's use of the handcuffs did not exceed the legal limits imposed on his authority.

## **CONCLUSION**

This action arises out of an unfortunate incident. There is little doubt that the plaintiff suffered a level of embarrassment and discomfort as a result of the police investigation into his involvement in the April 19 incident, an investigation that completely exonerated Barrows from any allegation of wrongdoing. Although the court is sensitive to Barrows's embarrassment, it is not the case that every discomfort suffered by the subjects of a police investigation rises to the level of a constitutional violation. There was probable cause to execute the search warrant, even taking all the facts and inferences in the light most favorable to Barrows and "correcting" the search warrant to include all of the information plaintiff seeks to include. Summary judgment is granted to the defendants on this issue.

Further, the use of handcuffs to temporarily detain Barrows during the execution of the search warrant was reasonable and justified. Coleman had a legitimate concern that an allegedly violent criminal would either try to escape before the collection of potentially incriminating evidence or could pose a danger to officers executing the warrant. The record shows that Coleman did not use the handcuffs at any time where the concerns justifying their use were not present and also that he did not use any force to detain Barrows once the searches were

completed. Summary judgment is granted to the defendants on this issue.

Plaintiff Marcus Barrows's motion for summary judgment **[doc. #19]** is **DENIED**.

Defendants's motion for summary judgment **[doc. #16]** is **GRANTED**. Judgment shall enter in

favor of defendants Neverill Coleman and Shannon Belcher on all counts. The Clerk of the Court

is ordered to close the case.

**IT IS SO ORDERED** at Hartford, Connecticut, this ___18th___ day of January, 2005.


_____**/s/DJS**_____
**DOMINIC J. SQUATRITO**
**UNITED STATES DISTRICT JUDGE**

14